Case 1:24-mj-00325-MAU    Document 1-1    Filed 10/

Case: 1:24-mj-00325
Assigned to: Judge Upadhyaya, Moxila A.
Assign Date: 10/16/2024
Description: COMPLAINT W/ ARREST WARRANT

## STATEMENT OF FACTS

Your affiant, ███████████, is a Special Agent assigned to the FBI's San Francisco Field Office. In my duties as a special agent, I investigate violations of federal law. Currently, I am tasked with investigating criminal activity in and around the Capitol grounds on January 6, 2021. As a Special Agent, I am authorized by law or by a government agency to engage in or supervise the prevention, detection, investigation, or prosecution of a violation of Federal criminal laws.

The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies or is based on a review of various documents, records, and reports. Because this Affidavit is submitted for the limited purpose of establishing probable cause, it does not contain every fact known by me or the FBI. The dates and times listed in this Affidavit should be read as "on or about."

### *Background: Events at the U.S. Capitol on January 6, 2021*

The United States Capitol is secured twenty-four hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. The Joint Session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Michael Richard Pence was present and presiding, first in the Joint Session, and then in the Senate Chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent security barricades were in place around the exterior of the U.S. Capitol. U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. U.S. Capitol Police officers attempted to maintain order and keep the crowd from entering the Capitol. Around 2:13 p.m., however, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the House of Representatives and Senate, including the President of the Senate, Vice President Pence, were instructed to and did evacuate the chambers. Accordingly, the Joint Session of Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the U.S. Capitol from the time he was evacuated from the Senate Chamber until the certification proceedings resumed.

During national news coverage of these events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without permission or authority to be there. One such individual was JEFFREY DALE SNYDER (SNYDER) of Oakland, California.

### *Facts Specific to JEFFREY DALE SNYDER*

Based upon review of public video, closed circuit television ("CCTV") footage and police body worn camera ("BWC") footage depicting the events at the U.S. Capitol building and grounds on January 6, 2021, law enforcement identified a man who appeared to assault officers with an electrified cane and possessed a stolen U.S. Capitol Police riot shield inside an area known as the Lower West Terrace "tunnel." The FBI posted a "be on the lookout" ("BOLO") for the individual with the assigned number 114-AFO and requested help from the public to identify the man. As set out in detail below, law enforcement has identified 114-AFO as JEFFREY DALE SNYDER ("SNYDER") and there is probable cause to believe that on January 6, 2021, SNYDER committed violations of 18 U.S.C. §§ 231(a) (civil disorder), 111(a)(1) and (b) (assaulting, resisting, or impeding certain officers using a deadly or dangerous weapon), 641 (theft of government property), and 1752(a)(1), (2) and (4) (unlawful entry, disorderly conduct, and physical violence on restricted buildings or grounds) and 40 U.S.C. §§ 5104(e)(2)(D) and (F) (disorderly and disruptive conduct and physical violence on Capitol grounds or buildings).

### A. 114-AFO's activities at the U.S. Capitol on January 6, 2021

Shortly after the attack on the U.S. Capitol that occurred on January 6, 2021, the FBI began reviewing evidence of the crime and designating certain individuals who assaulted law enforcement as individuals for whom the public should "be on the lookout" (BOLO). This BOLO designation was accompanied by a number. When the individual was believed to have assaulted a federal officer, it included the suffix "-AFO."

Following the events of January 6, 2021, the FBI identified a man depicted in video who appeared to have assaulted law enforcement officers defending an entrance to the United States Capitol on the Lower West Terrace known as "the tunnel," as described below. The FBI posted a photograph of this man under a BOLO labeled 114-AFO.

For example, the FBI identified 114-AFO in open-source video walking from the Ellipse, where the Stop the Steal rally had occurred that morning, to the U.S. Capitol. As depicted below, the man was wearing jeans, a black, red and white jacket, a red backpack, red baseball cap with insignia for the U.S. Marines and was walking with the assistance of what appeared to be a long black cane.



According to CCTV footage, 114-AFO approached the tunnel at approximately 2:58 p.m., now wearing a white facemask.



Another open-source video captured 114-AFO as he moved closer to the tunnel entrance, which was already filled with rioters struggling with police. As 114-AFO moved up, other rioters can be heard commenting about the "orange stuff" visible on the head of another rioter exiting the tunnel, noting "he's struggling." Another rioter on a bullhorn exhorts the crowd to "back up,

everyone back up, guys are trying to come out because they're getting gassed." 114-AFO then entered the tunnel as rioters fought hand-to-hand with police and other rioters yelled for "fresh people." As he moved forward deeper into the tunnel towards the police line, other rioters exited the tunnel past him. Many showed the effects of chemical irritants deployed by police in an effort to stop the rioters' assault. Below is a still image of 114-AFO from this open-source video.



Another open-source video shows 114-AFO after he pushed into the tunnel. 114-AFO reached over the shoulder of another rioter and sprayed a substance from a can at and on the police line defending the Capitol. He continuously sprayed the police line for ten seconds until it appeared that the can was empty. 114-AFO shook the canister as it ceased emitting spray. Below is a still image from this video showing 114-AFO's hand spraying the police line.



Another frame of the same video shows the label on the can that 114-AFO sprayed at police:



The appearance of the can deployed by 114-AFO on police in the tunnel appears consistent with Counter Assault bear spray. Below is a side-by-side comparison of an image of the Counter Assault bear spray from the internet and a zoomed-in image of the can in 114-AFO's hand:



After emptying the can of bear spray on police, 114-AFO fought to remain in the tunnel even as other rioters pushed their way past him towards the exit. Another video shows 114-AFO as he lifted his cane above other rioters' heads. In the below still image from the video, an illuminated red light is visible near the handle of 114-AFO's cane.



114-AFO then moved even closer to the police line until he was face to face with the police officers defending the tunnel. With the cane in his right hand and a stolen United States Capitol Police riot shield in his left, 114-AFO stood behind other rioters and watched the police. Below is a still image from MPD BWC showing 114-AFO standing near the police line with the black cane in his right hand and the light near the cane's handle still illuminated in red.



114-AFO then suddenly moved forward, extending his right arm and hand holding the black cane. In the still image from BWC below, the body of the cane is more visible and it is clear the cane has a number of segments with a textured body.



114-AFO then pointed the cane in the direction of the nearest MPD officer, Sergeant  J.P.



According to BWC footage, 114-AFO then jabbed the cane at Sergeant J.P. As he did so, the cane made a loud zapping/crackling sound audible on the BWC footage. The red light near the handle of the cane was also still illuminated. As the cane made this sound, another rioter on the floor of the tunnel appeared to yell "Oh, fuck that" in apparent fear as the device came near him as 114-AFO rammed it at the police line.

BWC footage shows that Sergeant J.P. then deployed his taser at 114-AFO. 114-AFO used the cane to swat away the taser's electrodes and as he did so, his white mask fell off.

The black cane utilized by 114-AFO matches the photograph and description of a product sold on Amazon named "Walking Cane for men & women – Adjustable, heavy duty, 1 Million

Volt Stun Device with ultra bright LED Flashlight." The product details listed on Amazon include the statement that the cane has "[a] Safety red light to indicate when the stun gun is on and ready to be used." Below is a screenshot of the product photograph and description from Amazon.



Seconds after 114-AFO jabbed Sergeant J.P. with the electrified cane, at approximately 3:11 p.m., the zapping/crackling sound of the cane is again heard on BWC. An officer then shouted, "Cattle prod, cattle prod!" Another officer yelled, "the taser's back!" The zapping sound is heard several more times in quick succession on BWC. Then another officer shouted "Cattle prod, cattle prod, red hat." In response, Sergeant J.P. called, "that's the guy I tased!" The zapping sound of the cane is then heard again. An officer then shouted "…watch out for that, he's tasing left!"

In or around June 2021, FBI agents interviewed Sergeant J.P. During the interview, Sergeant J.P. stated he had deployed his taser after being hit with what he believed was a cattle prod. Sergeant J.P. remembered hearing the device he identified as a cattle prod before being hit. Sergeant J.P. also recalled other officers noticing the sound of the item as well. Sergeant J.P. described the man who hit him with this device as an older white male with a coat and no mask.

In or around February, 2021, MPD Officer O.F. was also interviewed by the FBI. Officer O.F. described twice being hit in the leg with what he described as a cattle prod while he was in the Lower West Terrace tunnel.

After using his electrified cane on officers, 114-AFO remained in the tunnel. In fact, he joined other rioters shortly thereafter as they pushed together against the police line in a "heave ho motion." Below is a still image from an open-source video depicting 114-AFO, without his hat, joining the heave-ho push against the police in the tunnel.



114-AFO left the tunnel only when he was pushed out by police officers.



Another publicly-available video captured 114-AFO's exit from the tunnel and shows multiple officers having to shove 114-AFO to get him out of the tunnel.



At approximately the same time that 114-AFO was being pushed out of the tunnel with other rioters, rioters grabbed and dragged another MPD officer, Officer M.F., off of the police line in the tunnel and into the crowd on the Inaugural Stage. 114-AFO was feet away from Officer M.F. as he was attacked by other rioters. Below is a still image of an open-source video depicting 114-AFO circled in yellow near Officer M.F.



Another video shows 114-AFO at approximately this time pouring water on his eyes and face. Based on my training and experience, I believe 114-AFO was pouring water on his eyes to

decontaminate them from the effects of OC spray.



### B. Identification of JEFFREY DALE SNYDER as 114-AFO

In or around November 2022 and April 2023, the FBI received information identifying 114-AFO as JEFFREY DALE SNYDER.

Law enforcement then performed searches of law enforcement and open-source databases and located a potential residence for SNYDER in Oakland, California ("the Snyder Residence"). On or about July 18, 2024, an FBI agent performed physical surveillance at the Snyder Residence and observed a white male, matching the description of SNYDER using a garden hose to water plants on the exterior of the Snyder Residence. Based on a comparison of photographs of 114-AFO at the U.S. Capitol on January 6, and the agent's observations of the white male at the Snyder Residence, the agent believed that the white male was SNYDER.

Additionally, the FBI identified video of 114-AFO at or near the U.S. Capitol on January 6, 2021, with two women. Below is a still image of 114-AFO and the two women from an open-source video.



The FBI was also provided a photograph from the internet and an associated link appearing to depict 114-AFO and the same two women at a U.S. Marine Corps commissioning ceremony in San Francisco, California on January 8, 2022.



According to the website where the photograph appeared, the woman in uniform in the photograph has the last name Snyder. Below are side-by-side comparisons of each of the three people above. On the right are photographs from January 6, 2021, and on the left are photographs

from the open-source website.







According to records obtained from the U.S. Marine Corps, SNYDER is a U.S. Marine Corps veteran. SNYDER was on active duty from approximately 1977-1982 and in the Reserves from 1982 until 1985.

Finally, on or about October 3, 2024, agents with the FBI conducted an interview with one of SNYDER's neighbors ("Neighbor 1"). The agents showed Neighbor 1 photographs of 114-AFO on January 6, 2024. Neighbor 1 identified the man in the photographs as SNYDER.

### *Conclusion*

Based on the foregoing, your affiant submits that there is probable cause to believe that JEFFREY DALE SNYDER violated 18 U.S.C. § 111(a)(1) and (b), which makes it a crime to forcibly assault, resist, oppose, impede, intimidate, or interfere with any person designated in 18 U.S.C. § 1114 while engaged in or on account of the performance of official duties, while using a deadly or dangerous weapon or inflicting bodily injury. Persons designated within 18 U.S.C. § 1114 include federal officers such as USCP officers and include any person assisting an officer or employee of the United States in the performance of their official duties.

Your affiant submits there is probable cause to believe that SNYDER also violated 18 U.S.C. 231(a)(3), which makes it unlawful to commit or attempt to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function. For purposes of 18 U.S.C. § 231, a federally protected function means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof. This includes the Secret Service's protection of the Vice President and his family and the Capitol Police's protection of the U.S. Capitol.

Your affiant submits there is probable cause to believe that SNYDER violated 18 U.S.C. § 641, which makes it a crime for a person to embezzle, steal, purloin, or knowingly convert to his use or the use of another, or without authority, sell, convey or dispose of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or receive, conceal, or retain the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted.

Your affiant submits that there is probable cause to believe that SNYDER violated 18 U.S.C. § 1752(a)(1), (2), and (4), which make it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do so; and (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; (4) knowingly engage in any act of physical violence against any person or property in any restricted building or grounds; or attempts or conspires to do so. For purposes of 18 U.S.C. § 1752, a "restricted building" includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret

Service, including the Vice President, is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

Your affiant submits there is also probable cause to believe that SNYDER violated 40 U.S.C. § 5104(e)(2)(D) and (F), which make it a crime to willfully and knowingly (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; (F) engage in an act of physical violence in the Grounds or any of the Capitol Buildings.

Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 16th day of October 2024.

MOXILA A. UPADHYAYA
MAGISTRATE JUDGE